IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION


ALBERT BROWN BLOOM                                    PLAINTIFF


v.                        NO. 4:19-cv-00928 PSH


ANDREW SAUL, Commissioner of                          DEFENDANT
the Social Security Administration


## MEMORANDUM OPINION AND ORDER


INTRODUCTION. In this case, plaintiff Albert Brown Bloom ("Bloom")

maintains that the findings of an Administrative Law Judge ("ALJ") are not

supported by substantial evidence on the record as a whole.[1] Bloom so

maintains for what appears to be the following four reasons: 1) his mental

impairments and disorder of the spine meet or equal listed impairments,

and the ALJ erred when he failed to so find at step three of the sequential

---

[1] The question for the Court is whether the ALJ's findings are supported by "substantial evidence on the record as a whole and not based on any legal error." See Sloan v. Saul, 933 F.3d 946, 949 (8th Cir. 2019). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would accept it as adequate to support the [ALJ's] conclusion." See Id. "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." See Lucus v. Saul, 960 F.3d 1066, 1068 (8th Cir. 2020) [quoting Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted)].

evaluation process; 2) Bloom's residual functional capacity was erroneously assessed because his impairments were not adequately evaluated and because the ALJ made a flawed credibility determination; 3) the record was not fully developed with respect to Bloom's residual functional capacity; and 4) the ALJ relied upon the answer to an improperly phrased hypothetical question at step five.

EVIDENCE.[2] Bloom was forty-three years old on January 28, 2018, i.e., the day he allegedly became disabled. He alleged in his application for disability insurance benefits that he is disabled as a result of multiple impairments, the primary ones appearing to be mental impairments in the form of depression, anxiety, and post-traumatic stress disorder ("PTSD") and a physical impairment in the form of a back disorder.

Bloom served in the military from 1992 until 1996 and again from 2001 until 2018. See Transcript at 34. During a 2004 deployment, he experienced two "serious events." See Transcript at 771. The first event occurred when a roadside improvised explosive device exploded near his

---

[2]    The record in this case is not a model of clarity, and Bloom's recital of the medical evidence alone is roughly thirty-four pages long. As a result, the Court has had some difficulty summarizing the relevant portions of the medical evidence in a concise, chronological manner. Moreover, the record appears to be incomplete as certain portions of his treatment history, e.g., some of the progress notes from his chiropractic and mental health treatments, are not included. The summary of the evidence that follows is not exhaustive but is adequate to provide a context for addressing whether the ALJ's decision is supported by substantial evidence on the record as a whole.

Humvee. He was sitting in the driver's seat with the door open, and the blast wave forced the door to close, hitting his left leg. The second event occurred when the Australian Embassy was bombed, and he was about two hundred feet from the explosion.

I. MENTAL IMPAIRMENTS. Bloom has struggled with depression, anxiety, and PTSD for several years. On April 3, 2017, he was admitted to a Veterans Affairs ("VA") hospital for suicidal ideations. See Transcript at 407-414. He reported psychosocial stressors, his job, and chronic back pain as the reasons for his ideations. When he was discharged two days later, his condition was stable. He was continued on medication that included mirtazapine, and an evaluation at a PTSD clinic was recommended.

On April 5, 2017, Bloom was evaluated by a social worker. See Transcript at 713-718. The evaluation report includes the following note:

> ... [Bloom] reported today that this [i.e., the April 3, 2017, hospitalization] was an isolated incident stating that he had a "bad" reaction to pain medication and denied having experienced prior [suicidal ideations] in the past. [He] did report ongoing symptoms of depressed mood, anxiety, fatigue, poor sleep, chronic back pain ... hypervigilance, being easily startled, and trauma nightmares [which] have all been occurring since a reported trauma exposure during deployment. [Bloom] noted that he is currently receiving psychiatric care at the VA for posttraumatic symptoms which has been confirmed by this provider. [He] denied current thoughts of suicide, homicide, or self-harming behaviors. ...

3

See Transcript at 713. Bloom thereafter sought therapy for his complaints of depression and anxiety. See Transcript at 696-699 (04/13/2017), 679-682 (04/21/2017), 662-666 (04/28/2017), 649-653 (05/05/2017). The progress notes reflect that Bloom's condition improved as he returned to "normal life with his regular routines," see Transcript at 696, and attended PTSD group meetings. He denied any suicidal or homicidal ideations, had no thoughts of self-harm, and identified "multiple protective factors he ha[d] in place to prevent crisis situations." See Transcript at 696.

On November 13, 2017, Bloom was admitted to Baptist Health Medical Center for depression and suicidal ideations. See Transcript at 310-342. He identified his back pain as the cause of his mental health problems. He was started on gabapentin and continued on, inter alia, Celexa and Remeron. His condition improved, and he was discharged three days later.

Bloom thereafter saw a mental health counselor. See Transcript at 591-596 (11/16/2017), 582-586 (11/22/2017), 568-571 (11/30/2017), 555-559 (12/08/2017), 540-544 (12/14/2017), 525-529 (01/08/2018). By the time of the January 8, 2018, presentation, Bloom's memory and overall cognition were intact, his thought process was logical/linear, and his attention, insight, and judgment were within normal limits. The progress note from that presentation also includes the following observation:

4

> … [Bloom] returned today to continue addressing symptoms causing impairment to functioning. [He] noted that he continues to experience stability of mood and stated that his medications continue to play a big part in his improvement. [He] noted that he is working closely with his PCM … to ensure [Bloom's] medications are closely managed as this was an issue with previous decompensation. … [He] feels at this time he can step down to quarterly visits and denied the need for ongoing therapy. … [He] denied [suicidal ideations/homicidal ideations] or thoughts of self-harm.

See Transcript at 525-526.

On February 14, 2018, the VA issued a Rating Decision for a disability claim made by Bloom. See Transcript at 343-365. The VA awarded him benefits on account of service connected impairments that included what were identified as "[PTSD], generalized anxiety disorder, and major depressive disorder (also claimed as anxiety and manic depressant disorder)." See Transcript at 347. The Decision identified the evidence the VA relied upon in making the award, which included, inter alia, the following: difficulty adapting to stressful circumstances, difficulty adapting to work, depressed mood, difficulty adapting to a work-like setting, depression, and anxiety. The Decision also noted an "[o]ccupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks …" See Transcript at 347.

On May 23, 2018, Bloom was seen by Dr. Florian Keplinger, M.D., ("Keplinger") for a traumatic brain injury evaluation. See Transcript at 768-774, 784-786. The evaluation reflects that Bloom complained of, inter alia, difficulties concentrating, remembering, and making decision. Keplinger diagnosed a traumatic brain injury and opined that the majority of Bloom's current clinical symptomatology were related to mental health concerns, a sleep disorder, and chronic pain. Keplinger's recommendations included neuropsychological testing.

Sometime in 2018, Bloom was apparently hospitalized for suicidal thoughts. See Transcript 1102. By January 4, 2019, he reported feeling "great overall" after his medication was adjusted. See Transcript at 1102.

II. PAIN. Bloom has also struggled with back pain. Testing of his back during 2015 and 2016 revealed the following: MRI testing of his lumbar spine revealed "[m]ild L5-S1 spondylostenosis," see Transcript at 1039, and x-rays of his cervical spine revealed "[m]ild degenerative changes" with "minimal spondylosis at C6-C7," see Transcript at 509. MRI testing of his thoracic spine revealed areas of disc desiccation and a "minimal annular bulge at T7-T8." See Transcript at 1041. A later MRI of his cervical spine revealed some suggestion of very mild right neuroforaminal narrowing at C3-C4 with mild facet arthropathy. See Transcript at 1042.

6

On January 4, 2017, Bloom was seen at a military facility for complaints of pain in his neck, shoulders, and back. See Transcript at 507-510. The summary of the presentation indicates that he had tenderness on palpation at several points in his neck and back and a limited range of motion in his cervical spine. He was treated with medication and dry needling therapy.

Throughout 2017, Bloom continued to seek medical attention at military facilities for his neck and back pain.[3] The progress notes reflect that his treatment included steroid injections, muscle relaxers, and pain medication. An MRI of his thoracic spine revealed a central disc protrusion at T7-T8 causing "mass effect on the ventral thecal sac," but no significant canal narrowing or abnormal cord signal were observed. See Transcript at 454. An MRI of his lumbar spine revealed "Grade 1 retrolisthesis of L5 over S1" with a "[d]isc osteophyte complex causing mild to moderate bilateral neural foraminal region at L5-S1." See Transcript at 456. An MRI of his cervical spine revealed "[r]ight C3/C4 facet joint inflammation with

---

[3]      It is difficult to know how many times Bloom was seen as the record is not clear. Notwithstanding consultations that were done over the telephone, it appears that he was seen on multiple occasions. See e.g., Transcript at 507-511 (01/04/2017), 511-513 (01/11/2017), 513-514 (01/23/2017), 514-520 (01/27/2017), 628-635 (05/26/2017), 618-622 (07/19/2017), 420-423 (10/17/2017), 394-401 (12/20/2017).

adjacent marrow and soft tissue edema." <u>See</u> Transcript at 457-458. The severity of his pain decreased, in part, because he changed his activities.

On January 19, 2017, Bloom saw Dr. William Ackerman, M.D., ("Ackerman") for complaints of back pain. <u>See</u> Transcript at 1034-1038. Bloom described his pain as constant, aggravated by activity. A physical examination revealed that he had a painful range of motion in his neck and back. Ackerman diagnosed, <u>inter alia</u>, degenerative disc disease of the lower cervical spine at C5/6 and degenerative disc disease of the lower lumbar spine at L4/5. Ackerman's recommendations included epidural steroid injection therapy and continued pharmacological management with medications that included Tizanidine and Belbuca film, an opioid.

Throughout 2017 and into 2018, Bloom saw Ackerman on multiple occasions for pain management.[4] The progress notes reflect that Bloom reported constant back pain aggravated by activity but improved with medication, heat, and rest. His gait and balance were normal, his straight leg raises were negative, and he could tolerate some exercise. He had a decreased range of motion in his lumbar spine, and the pain was made

---

[4]     <u>See</u> Transcript at 1031-1033 (01/27/2017), 1015 (02/16/2017), 1028-1030 (03/15/2017), 1025-1027 (06/15/2017), 1022-1024 (06/29/2017), 1019-1021 (07/20/2017), 1016-1018 (09/20/2017), 1012-1014 (05/25/2018), 1009-1011 (06/21/2018), 1006-1008 (07/19/2018), 1002-1004 (08/16/2018), 999-1001 (09/13/2018), 996-998 (10/17/2018).

worse with flexion. He received steroid injections, came to use a TENS unit and back brace, and was continued on pharmacologic management.

On May 14, 2017, Bloom presented to the Saline Memorial Hospital complaining of pain in his neck and back. See Transcript at 261-265. He described the pain as dull and moderate in severity. A physical examination revealed "[t]enderness, midline to the upper back, midline to the lower back, paraspinal to the upper back, paraspinal to the lower back." See Transcript at 264. Medications that included Ketorolac were prescribed.

On May 25, 2017, Bloom sought emergency room care at both Saline Memorial Hospital and Baptist Health Medical Center for tingling and numbness in his face and neck. See Transcript at 251-260, 300-309. He characterized the severity of his symptoms as moderate. A physical examination was unremarkable, and a CT scan was negative. His potassium was believed to be low, and he was treated accordingly.

On August 16, 2017, Bloom was seen at Arkansas Specialty Orthopaedics for an evaluation of his upper back pain. See Transcript at 982, 984-985. He described the pain as a sharp, severe pain between his shoulders, "like a knife stabbing him." See Transcript at 984. A physical examination revealed a normal gait and station, appropriate range of motion of the neck, and appropriate and symmetric strength in his arms.

He had an appropriate, non-painful range of motion in his shoulders.

Bloom's medical testing was reviewed and noted to be as follows:

> I reviewed [Bloom's] x-rays of his thoracic spine which reveal[ed] mild degenerative changes. I reviewed the MRI of his lumbar spine which again revealed multilevel mild degenerative changes. I reviewed the cervical MRI which reveal[ed] disc bulging at C5-6 and C6-7. There is no root impingement or herniated disc. I reviewed the MRI of his thoracic spine which reveal[ed] mild degenerative changes. Again I do not see any spinal stenosis herniated disc or nerve root impingement.

See Transcript at 984-985. The progress note reflects that there was "absolutely nothing on [Bloom's] image findings to support [why] he has this pain." See Transcript at 985.

Beginning on February 6, 2018, Bloom received approximately forty-two chiropractic treatments for his neck and back pain. See Transcript at 860-973. At the first presentation, he had a mild to moderate, yet painful, range of motion in his spine. After a series of treatments, he reported that his condition was improving. See Transcript at 841. He was able to ride a horse, see Transcript at 872, and had travelled to Texas and back for a fishing competition, see Transcript at 903. Bloom nevertheless continued to complain of pain that was aggravated by movement and prolonged sitting. At the last presentation, he reported that he continued to have

significant back pain, noting that he had aggravated his back while moving into a new house and while participating in events at his church.

As the Court has noted, on February 14, 2018, the VA issued a Rating Decision for a disability claim made by Bloom. <u>See</u> Transcript at 343-365. The VA awarded him benefits on account of impairments that included what were identified as "cervical spine arthritis (claimed as cervical disc degeneration)," and "lumbosacral strain with lumbar spine arthritis (claimed as joint pain all over body)." <u>See</u> Transcript at 348, 350. He was awarded benefits on the basis of medical testing confirming arthritis in his cervical and lumbar spines and physical examinations indicating a painful, limited range of motion in the cervical and lumbar portions of his spine.

On March 2, 2018, or approximately one month after the alleged onset date, Bloom was seen by Dr. Jennifer Ames, M.D., ("Ames") to establish care. <u>See</u> Transcript at 841-843. Bloom reported that his PTSD and depression were well-controlled with medication, noting that he was taking medication for both impairments. With respect to his back pain, he reported "several areas of concern including his lumbar spine and cervical spine with degenerative disc disease as well as [a] bulging disc in his lower back." <u>See</u> Transcript at 841. Nevertheless, he reported that his back pain was controlled with gabapentin and diclofenac such that he could function

and stay active, and he wanted to avoid opioid medications. A physical examination was unremarkable, and he was continued on medication.

Bloom thereafter saw Ames on several occasions throughout 2018 and 2019. See Transcript at 837-840 (05/18/2018), 832-834 (07/20/2018), 1105-1106 (10/02/2018), 1102-1104 (01/04/2019), 1100-1101 (04/05/2019), 1095-1096 (05/29/2019). The progress notes reflect that the severity of Bloom's back pain fluctuated. At times, he reported worsening pain caused, in part, by an ATV accident. At other times, he reported that his pain was much better controlled after his medication was adjusted and he received radiofrequency ablations. He also complained of memory loss, and she recommended neuropsychiatric testing. The physical examinations performed during the period were largely unremarkable. Ames made note of Bloom's mental health, noting that its severity also fluctuated. At times, he reported feeling well; at other times, he reported increased anxiety caused by "family and social stressors." See Transcript at 832.

Throughout 2018, Bloom also continued to seek treatment at VA facilities for his neck and back pain. See Transcript at 792-798 (05/08/2018); 768-774, 784-792 (05/23/2018), 780-784 (06/14/2018), 777-780 (06/29/2018), 854-858 (07/20/2018). The progress notes reflect that he continued to experience pain in his neck and back and began to have

difficulty walking. He nevertheless was occasionally observed to have a full range of motion and full strength in his cervical and lumbar spines.

On August 1, 2018, Bloom saw Dr. Wayne Bruffett, M.D., ("Bruffett") at Arkansas Speciality Orthopaedics for complaints of back pain. <u>See</u> Transcript at 980-981, 987-989. Bloom reported chronic, severe, constant pain in the thoracic region of his spine and reported that the pain was made worse by activity. A physical examination revealed the following:

> … [G]ait and station are normal. Neck[:] normal inspection with no areas of tenderness[,] normal ROM[,] stability[,] and strength[,] no skin changes noted[;] low back has normal inspection and mild tenderness to palpation[,] slight decreased ROM with good stability and strength[,] no marked skin changes noted. Right lower extremity has normal inspection and no specific areas of tenderness with good ROM[,] good stability and strength[,] no major skin changes noted[;] left lower extremity has normal inspection with no marked areas of tenderness[,] good ROM[,] good stability and strength[,] no major skin changes noted[,] pulses are intact[,] … Coordination and balance are normal.

<u>See</u> Transcript at 980.[5] Bruffett reviewed Bloom's prior imaging and obtained x-rays of Bloom's cervical spine. Bruffett noted that the x-rays revealed "just some mild degenerative changes." <u>See</u> Transcript at 980. He diagnosed "[c]hronic mid back pain[;] thoracic and cervical disc

---

[5]     The transcription of the notes Bruffett made during the examination contains very little punctuation.

degeneration." See Transcript at 980. Bruffett recommended an up-to-date MRI, noting that Bloom had not had one since 2016.

Bloom saw Bruffett again on September 10, 2018. See Transcript at 977-979. X-rays of Bloom's thoracic spine showed mild degenerative changes, see Transcript at 977, and an MRI of his thoracic spine showed no spinal canal stenosis, foraminal stenosis, or disc herniation, see Transcript at 986. Bruffett's diagnosis remained unchanged, and he observed that he could not see any specific cause for Bloom's thoracic pain.

Beginning on October 16, 2018, Bloom saw Drs. Joseph Jansen, M.D., ("Jansen") and Ahmed Ghaleb, M.D. ("Ghaleb") at the Advanced Spine and Pain Center.[6] The progress notes reflect that Bloom described his pain as a sharp, shooting, stabbing, throbbing pain made worse by lifting but improved with heat, massage, and medication. Upon physical examination, he had pain, tenderness, and a restricted range of motion in his thoracic and lumbar spines. Bloom had full strength in his upper and lower extremities, a normal gait, negative straight leg raises, and required no assistive device to walk. A back brace was prescribed, and it proved helpful. Medial branch blocks and pain medication were also prescribed.

---

[6]    See Transcript at 1088-1093 (10/16/2018), 1083-1087 (11/02/2018), 1078-1082 (11/26/2018), 1075-1077 (12/13/2018), 1072-1074 (01/03/2019), 1068-1071 (03/14/2019), 1064-1067 (05/06/2019).

He also received thoracic radiofrequency ablation during the period, and he reported a greater than fifty percent improvement in his pain.

III. ADMINISTRATIVE RECORDS AND REVIEW. In 2018, Bloom's medical records were reviewed by state agency medical experts. See Transcript at 54-65, 68-85. The experts opined that he had mild to moderate limitations caused by his mental impairments. The experts also believed that he was capable of performing a reduced range of light work.

The record contains more than one summary of Bloom's earnings history. See Transcript at 172-186. Taken together, they reflect that he has an outstanding work history.

Bloom completed a series of documents in connection with his application. See Transcript at 200, 202, 214-221. In the documents, he represented, inter alia, that he suffers from fatigue and requires several naps during the day. He experiences constant pain, and it impacts his ability to stand/walk, sit, bend, reach, and lift. At the time he completed the documents, his medications included gabapentin, citalopram, and mirtazapine. The medications help keep his pain manageable. He can stand/walk and sit for about one to two hours but has constant pain. Bloom can attend to most of his own personal care, although he requires help bathing and putting on his shoes and socks. He also requires special

reminders to attend to his personal care. He can prepare simple meals, perform light house work, shop for groceries, and attend church.

Bloom testified during the administrative hearing. See Transcript at 34-46. He is approximately sixty-three inches tall and weighs 219 pounds. He is unable to work because of his back pain, which impairs his ability to stand/walk, sit, lift, and bend. His medication makes him tired, and gabapentin causes him to gain weight. Bloom sometimes uses an assistive device to walk and uses a back brace when he lifts heavy objects. He has difficulty with his memory, and his wife handles the family's finances. In his spare time, he does paperwork for about three hours a week for a non-profit organization serving soldiers. He is also involved in a recovery program, which meets twice a week.

The ALJ found at step two of the sequential evaluation process that Bloom's severe impairments include PTSD, depression, chronic pain syndrome, lumbar spine spondylosis, and cervical spine degenerative disc disease. At step three, the ALJ found that Bloom does not have an impairment, or combination of impairments, meeting or equaling a listed impairment. Specifically, the ALJ found that Bloom's mental impairments do not meet or equal Listings 12.02, 12.04, or 12.15, and his spine disorder does not meet or equal Listing 1.04. The ALJ then assessed Bloom's residual

functional capacity and found that he is capable of performing sedentary work with the following additional limitations:

> … the claimant can perform occupations that do not require climbing of ladders, ropes, or scaffolds and no more than occasional climbing of ramps or stairs, balancing, stooping, kneeling, crouching, or crawling duties. The claimant can perform no more than occasional bilateral overhead reaching duties. The claimant is limited to simple, routine, repetitive task jobs with supervision that is simple, direct, and concrete and work that is SVP 1 or 2 jobs that can be learned within 30 days that do not require interaction with the general public, and no more than occasional changes to the workplace setting.

See Transcript at 15. In so finding, the ALJ gave no weight to the VA's Rating Decision and discounted the opinions of the state agency medical experts. The ALJ found at step four that Bloom is unable to perform his past work. At step five, the ALJ found that there is work available for a hypothetical individual with Bloom's limitations. The ALJ identified the work as that of a document preparer and table worker. On the basis of the finding, the ALJ concluded that Bloom is not disabled for purposes of the Social Security Act.

STEP THREE ERROR. Bloom first maintains that his mental impairments meet or equal Listings 12.04 and 12.15, and the ALJ erred when he failed to so find at step three. Specifically, Bloom maintains that his impairments satisfy the Listings' paragraph B criteria as the

impairments impact his ability to understand, remember, and apply information, and his ability to concentrate, persist, and maintain pace.

At step three, the ALJ is required to determine whether a claimant's impairments meet or equal a listed impairment. See Raney v. Barnhart, 396 F.3d 1007 (8th Cir. 2005). The determination is strictly a medical determination. See Cockerham v. Sullivan, 895 F.2d 492 (8th Cir. 1990).

Listing 12.04 encompasses depressive, bipolar, and related disorders, and Listing 12.15 encompasses trauma and stressor-related disorders. The Listings require the claimant to satisfy either the Paragraph B criteria or the Paragraph C criteria.[7] The Paragraph B criteria require the showing of an "extreme" limitation of one area, or "marked" limitation of two areas, of mental functioning.[8] Two of the four areas of mental functioning are the ability to understand, remember, or apply information, and the ability to concentrate, persist, or maintain pace.[9]

---

[7]     Paragraphs B and C of Listing 12.04 are identical to Paragraphs B and C of Listing 12.15.

[8]     An "extreme" limitation means the claimant is "not able to function in this area independently, appropriately, effectively, and on a sustained basis." See Listing 12.00F(2)(e). A "marked" limitation means his functioning in this area "independently, appropriately, effectively, and on a sustained basis is seriously limited." See Listing 12.00F(2)(d).

[9]     In addition to the ability to understand, remember, or apply information, and the ability to concentrate, persist, or maintain pace, Paragraph B identifies two other areas of mental functioning. They are the ability to interact with others and the ability to adapt or manage oneself. Bloom does not challenge the findings that he has

The ALJ found that Bloom's mental impairments do not satisfy the Paragraph B criteria. In so finding, the ALJ found that Bloom has only "mild" limitations in understanding, remembering, or applying information, and in concentrating, persisting, or maintaining pace.[10]

Substantial evidence on the record as a whole supports the ALJ's consideration of Bloom's mental impairments at step three. Although Bloom suffers from depression, anxiety, and PTSD, the ALJ could find that Bloom has only a "mild" limitation in understanding, remembering, and applying information, and a "mild" limitation in concentrating, persisting, or maintaining pace. The Court so finds for two reasons.

First, although Bloom has had a traumatic brain injury and has problems with his memory, the ALJ could find that Bloom does not have an "extreme" or "marked" limitation in understanding, remembering, or applying information. On January 8, 2018, or twenty days before the alleged onset date, his memory and overall cognition were intact and within normal limits, his thought process was logical/linear, and his insight

---

"moderate" limitations in interacting with others and in adapting or managing oneself. He also does not challenge the finding that his impairments do not meet or equal the Paragraph C criteria.

[10]   An "mild" limitation means the claimant's functioning in this area "independently, appropriately, effectively, and on a sustained basis is slightly limited." See Listing 12.00F(2)(b).

and judgment were within normal limits. <u>See</u> Transcript at 526. After the alleged onset date, Bloom made only sporadic complaints of memory loss. For instance, Bloom saw Ames on several occasions, and she only once noted his difficulties with memory. <u>See</u> Transcript at 1095. Bloom is able to follow written and spoken instructions "pretty good," <u>see</u> Transcript at 219, and does paperwork for a non-profit organization each week, <u>see</u> Transcript at 42. He can drive an automobile, go out alone, pay bills, count change, handle a savings account, and use a checkbook. <u>See</u> Transcript at 217. Although Bloom's wife does many of the activities for him, the ALJ could find that Bloom is nevertheless capable of doing them.

Second, although Bloom has difficulty concentrating, the ALJ could find that Bloom does not have an "extreme" or "marked" limitation in concentrating, persisting, and maintaining pace. It bears repeating that twenty days before the alleged onset date, Bloom's attention and overall cognition were intact and within normal limits, and his thought process was logical/linear. <u>See</u> Transcript at 526. Bloom is able to follow written and spoken instructions "pretty good," estimating that he can pay attention for about an hour. <u>See</u> Transcript at 219. Bloom can attend to most of his own personal care, although he requires special reminders to do so. He can prepare simple meals, perform light house work, and shop for groceries.

He volunteers with a non-profit organization and admirably assists in a recovery program at his church.

Bloom faults the ALJ for making note of the following: "Although [Bloom] alleged some memory loss and problems making decisions, he did not follow-through with a neuropsychological assessment or make additional complaints of these symptoms for one year." See Transcript at 14. The ALJ did not err in so noting as Bloom concedes that he did not follow-through with the neuropsychological assessment recommended by Keplinger in May of 2018. Bloom places the blame for the failure on the VA, and he might be right. The Court is not persuaded, though, that the ALJ placed too much weight on Bloom's failure to follow-through with the recommended neuropsychological assessment.

Bloom maintains that the Court should consider a September 13, 2019, psychological evaluation in determining whether the ALJ properly considered Bloom's mental impairments at step three. See Docket Entry 13, Exhibit A. The Court will not consider the evaluation because it was prepared after the ALJ's August 27, 2019, decision and does not appear to have been presented to the Appeals Council, see Transcript at 1-5, 166. Moreover, Bloom has failed to show good cause for failing to submit the

evaluation during the administrative proceeding, or why the Court should consider the evaluation at this late juncture.

Bloom next maintains that his disorder of the spine meets or equals Listing 1.04, and the ALJ erred when he failed to so find at step three. Bloom maintains that "MRIs of [his] spine show[] that [he] ha[s] radiculopathy was well as other nerve compression issues." See Docket Entry 13 at CM/ECF 51.[11]

Listing 1.04 encompasses disorders of the spine resulting in compromise of a nerve root or the spinal cord. Paragraph A of the Listing additionally requires the following:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting or supine).

The ALJ found that Bloom's disorder of the spine does not meet or equal Paragraph A. The ALJ so found because there is no evidence of "nerve root compression in a neuro-anatomic distribution with motor, sensory, or reflex loss, or spinal arachnoiditis confirmed by operative note or

---

[11]     Bloom does not maintain that his disorder of the spine meets or equals Paragraphs B or C of Listing 1.04.

pathology report or lumbar spinal stenosis resulting in pseudoclaudication with an inability to ambulate effective ..." <u>See</u> Transcript at 13.

Substantial evidence on the record as a whole supports the ALJ's consideration of Bloom's disorder of the spine at step three. Without question, Bloom has a disorder of the spine, and the ALJ properly found that Bloom did. The ALJ could and did find, though, that the impairment does not meet or equal the Paragraph A criteria. The Court so finds for two reasons.

First, as the Commissioner correctly notes, "[Bloom] failed to mention exactly which MRIs he is referencing." <u>See</u> Docket Entry 14 at CM/ECF 5. The Court is therefore left to guess as to what medical testing supports Bloom's assertion that his disorder of the spine satisfies the Paragraph A criteria.

Second, the medical evidence is inconclusive at best. Testing performed prior to the alleged onset date revealed, <u>inter</u> <u>alia</u>, degenerative changes and bulging discs in the cervical, thoracic, and lumbar portions of Bloom's spine, but the changes were typically characterized as mild to moderate. <u>See</u> Transcript at 1039, 509, 1041, 1042, 454, 456, 457-458, 984-985. Testing and physical examinations performed after the alleged onset date were equally unremarkable. Ames'

progress notes reflect that the severity of Bloom's pain fluctuated. See Transcript at 841-843, 837-840, 832-834, 1105-1106, 1102-1104, 1100-1101, 1095-1096. Bruffett's August 1, 2018, progress note reflects that x-rays of Bloom's cervical spine revealed "just some mild degenerative changes." See Transcript at 980. Bruffett's examination of Bloom revealed findings consistent with the results of the x-rays. X-rays of Bloom's thoracic spine subsequently obtained showed mild degenerative changes, see Transcript at 977, and an MRI of his thoracic spine showed no spinal canal stenosis, foraminal stenosis, or disc herniation, see Transcript at 986. The progress notes from Advanced Spine and Pain Center also offer little to support Bloom's assertion.

Bloom alternatively maintains that he was diagnosed with other conditions medically equivalent to Paragraph A. The inquiry at step three is not, though, whether a claimant was diagnosed with an impairment. Instead, the inquiry is whether the impairment meets or equals a listed impairment. Here, he has failed to show how any of his other conditions meet or equal paragraph A of Listing 1.04.

RESIDUAL FUNCTIONAL CAPACITY. Bloom offers a second reason why the ALJ's findings are not supported by substantial evidence on the record as a whole. Bloom maintains that his residual functional capacity was

erroneously assessed because his impairments were not adequately evaluated and because the ALJ made a flawed credibility determination.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of the most the claimant can do despite his limitations. See Brown v. Barnhart, 390 F.3d 535 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record. See Jones v. Astrue, 619 F.3d 963 (8th Cir. 2010). As a part of the assessment, the ALJ must evaluate the claimant's subjective complaints. See Pearsall v. Massanari, 274 F.3d 1211 (8th Cir. 2001). The ALJ does so by determining whether the claimant has a medically determinable impairment that could reasonably be expected to produce pain or other symptoms and, if so, by evaluating the intensity, persistence, and limiting effects of the pain or other symptoms. In making the evaluation, the ALJ must consider all the evidence, including evidence of the following:

> (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment a claimant uses or has used to relieve pain or other symptoms …; and (7) any other factors concerning a

claimant's functional limitations and restrictions due to pain or other symptoms.

See Social Security Ruling 16-3p.

The ALJ assessed Bloom's residual functional capacity and found that he is capable of performing a reduced range of sedentary work. With regard to the work-related limitations caused by Bloom's mental impairments, the ALJ restricted Bloom to simple, routine, repetitive tasks with Specific Vocational Preparation 1 or 2 jobs. The ALJ found that the restriction will reduce the aggravation of stress in the work environment and accounts for Bloom's memory problems. With regard to the work-related limitations caused by Bloom's physical impairments, the ALJ restricted Bloom to work with no climbing of ladders, ropes, or scaffolds; no more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, or crawling; and no more than occasional bilateral overhead reaching.

The question for the ALJ was not whether Bloom has mental impairments in the form of depression, anxiety, and PTSD, and physical impairments in the form of, inter alia, a spine disorder. Bloom undoubtedly does. The question for the ALJ was the extent to which the impairments impact the most Bloom can do. The ALJ incorporated limitations caused by the impairments into the assessment of Bloom's residual functional

26

capacity. Substantial evidence on the record as a whole supports the assessment as the ALJ adequately considered all the relevant evidence in making the assessment.

The ALJ adequately considered the medical evidence relevant to Bloom's mental impairments. The ALJ properly noted that Bloom was hospitalized on what appears to have been three occasions for depression and suicidal ideations caused by psychosocial stressors, his job, and chronic back pain. See Transcript at 15, 19, 20. The first two hospitalizations were in 2017 and were only for a few days. See Transcript at 407-414, 310-342. Upon Bloom's discharge from the first hospitalization, he reported that it was "an isolated incident" as a result of a "'bad' reaction to pain medication." See Transcript at 713. There is little evidence documenting his third hospitalization, which apparently occurred in 2018. Ames' progress note from January 4, 2019, reflects that Bloom reported feeling "great overall" after his medication was adjusted. See Transcript at 1102.

The ALJ properly noted that prior to the alleged onset date, Bloom sought therapy/counseling for his mental health problems. See Transcript at 19-20. The progress notes reflect that Bloom's condition improved with, inter alia, the use of medication and the resumption of a regular routine. See Transcript at 696, 679, 663, 650, 582, 568, 556, 540-541. At a January

8, 2018, session, his memory and overall cognition were intact and within normal limits, his thought process was logical/linear, and his insight and judgment were within normal limits. See Transcript at 526.

After the alleged onset date, the record contains little in the way of therapy/counseling notes for Bloom's mental health problems. The bulk of the evidence touching on his mental health problems comes from the progress notes prepared by medical professionals who were seeing him for other problems. For instance, the ALJ noted Ames' progress note from March 2, 2018, see Transcript at 20, a note in which Bloom reported that his PTSD and depression were well-controlled with medication, see Transcript at 841. Bloom thereafter saw Ames on a number of occasions, and a fair reading of Ames' progress notes reflects that the severity of Bloom's mental health problems fluctuated. See Transcript at 837-840, 832-834, 1105-1106, 1102-1104, 1100-1101, 1095-1095. At times, Bloom reported feeling well; at other times, he reported increased anxiety caused by situational stressors. The ALJ also properly noted the traumatic brain injury evaluation performed by Keplinger on May 23, 2018. See Transcript at 14, 20. During the course of the evaluation, Bloom complained of, inter alia, difficulties concentrating, remembering, and making decisions. Keplinger diagnosed Bloom with a traumatic brain injury and observed that

the majority of Bloom's "current clinical symptomatology [was] related to mental health concerns, [a] sleep [disorder], and chronic pain." See Transcript at 773.

The ALJ adequately considered the non-medical evidence relevant to Bloom's mental impairments, and there is no merit to Bloom's assertion that the ALJ made a flawed credibility determination with respect to the limitations caused by those impairments. Bloom is capable of driving an automobile, going out alone, paying bills, counting change, handling a savings account, and using a checkbook. See Transcript at 217. Although Bloom requires special reminders to attend to his personal care and has problems with concentration and memory, the ALJ properly noted that Bloom is capable of following written and spoken instructions "pretty good," does paperwork for a non-profit organization for two to three hours each week, reported no difficulty getting along with others, participates in a recovery program, and attends church regularly. See Transcript at 14.[12] The ALJ also properly noted the therapy/counseling Bloom received both before and after the alleged onset date, and the medication he took to

---

[12]    Bloom faults the ALJ for observing that Bloom is capable of performing paperwork for a non-profit organization two to three "times per week," see Transcript at 14, when Bloom testified that he does so only two to three "hours a week," see Transcript at 42. Assuming, arguendo, that the ALJ misstated the record, it is of no consequence.

help control his symptoms. See Transcript at 19-20. The ALJ could and did find that the therapy/counseling and medication help Bloom manage his symptoms.

The ALJ adequately considered the medical evidence relevant to Bloom's physical impairments. With respect to Bloom's spine disorder, the ALJ properly noted the medical testing and examination results. See Transcript at 17-18. A summary of the medical testing and examination results need not be repeated; it is sufficient to note that they are inconsistent. The medical testing revealed mild to moderate degenerative changes. For instance, Bruffett saw Bloom on August 1, 2018, reviewed the prior medical testing, and found only mild degenerative changes. See Transcript at 980. Bruffett subsequently obtained additional medical testing and again found only mild degenerative changes. See Transcript at 977. The examination results also varied. For instance, Bruffett's examination of Bloom was largely unremarkable, see Transcript at 980, but Jansen and Ghaleb repeatedly found that Bloom had pain, tenderness, and a restricted range of motion in his thoracic and lumbar spine. See Transcript at 1090, 1085, 1080, 1070, 1065. Because the medical testing and examination results are capable of more than one acceptable interpretation, the ALJ could construed them as he did. The fact that there

is some evidence supporting Bloom's position does not mean the ALJ's decision is not supported by substantial evidence on the record as a whole. See Adamczyk v. Saul, --- Fed.Appx. ---, 2020 WL 3957172 (8th Cir. 2020).

The ALJ also properly noted the medical testing and examination results relevant to Bloom's other physical impairments. See Transcript at 16-19. The ALJ found that some of the impairments, e.g., neck pain, hernia surgery, sleep apnea, and hypertension, give rise to work-related limitations, and the ALJ incorporated the limitations into the assessment of Bloom's residual functional capacity. See Transcript at 18. Because the medical testing and examination results with respect to those impairments is capable of more than one acceptable interpretation, the ALJ could construe them as he did.

The ALJ also adequately considered the non-medical evidence relevant to Bloom's physical impairments, and there is no merit to Bloom's assertion that the ALJ made a flawed credibility determination. The ALJ could and did find that Bloom's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but Bloom's statements concerning the intensity, persistence, and limiting effects of

the symptoms were not consistent with "the balance of the record as a whole." See Noerper v. Saul, 964 F.3d 738, 745, n.3 (8th Cir. 2020).[13]

The ALJ made note of Bloom's daily activities. Bloom can attend to most of his own personal care, although he requires help bathing and putting on his shoes and socks. See Transcript at 215. He can prepare simple meals, perform light house work, shop for groceries, and attend church. See Transcript at 216-218. He also does paperwork for a non-profit organization and participates in a recovery program. See Transcript at 41-43. There is also evidence that after the alleged onset date, he rode horses, see Transcript at 872, travelled to Texas and back for a fishing competition, see Transcript at 903, and rode an ATV, see Transcript at 837. Those activities are certainly not dispositive, but they go to the consistency of his statements concerning the intensity, persistence, and limiting effects of his symptoms.

The ALJ noted the location, duration, frequency, and intensity of Bloom's pain or other symptoms and considered factors that precipitate and aggravate the symptoms. For instance, the ALJ noted Bloom's assertion

---

[13]     Social Security Ruling 16-3p eliminated the use of the word "credibility" in making disability determinations and requires the ALJ to consider the consistency between "subjective assertions and the balance of the record as a whole." See Noerper v. Saul, 964 F.3d at 745, n.3 (8th Cir. 2020). The Ruling "largely changes terminology rather than the substantive analysis to be applied." See Id.

that he is in constant pain, pain made worse with "standing, sitting, lifting, cleaning, walking, and reaching." See Transcript at 16. It was for the ALJ to determine the weight accorded the evidence offered with respect to those factors, and the Court cannot find that the ALJ accorded the evidence improper weight.

The ALJ also noted the type, dosage, effectiveness, and side effects of Bloom's medication, and the treatment he has received. For instance, the ALJ noted that Bloom stopped taking narcotics and opioids, and the medication he does take causes fatigue. The ALJ noted that Bloom has also received dry needling therapy, steroid injections, numerous chiropractic treatments, and used a TENS unit. The ALJ additionally noted that Bloom uses a "back brace when he does any lifting of heavy objects." See Transcript at 16. Again, it was for the ALJ to determine the weight accorded the evidence offered with respect to those factors, and the Court cannot find that the ALJ accorded the evidence improper weight.

The governing standard in this case, i.e., substantial evidence on the record as a whole, allows for the possibility of drawing two inconsistent conclusions. See Culbertson v. Shalala, 30 F.3d 934 (8th Cir. 1994). The ALJ crafted an assessment of Bloom's residual functional capacity that limited

him to a reduced range of sedentary work, and Bloom has not shown how the ALJ erred in doing so.

FAILURE TO DEVELOP THE RECORD. Bloom offers a third reason why the ALJ's decision is not supported by substantial evidence on the record as a whole. Bloom maintains that the record was not fully developed because the ALJ gave no weight to the VA's Rating Decision.

The ALJ has a duty to fully develop the record. See Battles v. Shalala, 36 F.3d 43 (8th Cir. 1994). There is no bright line test for determining whether the ALJ fully developed the record; the determination is made on a case by case basis. See Id. It involves examining whether the record contains sufficient information for the ALJ to have made an informed decision. See Pratt v. Asture, 372 Fed.Appx. 681 (8th Cir. 2010).

Here, the ALJ noted the VA's Rating Decision. He gave it no weight for the following reason: "The undersigned did not provide articulation about the evidence that is inherently neither valuable nor persuasive in accordance with 20 CFR 404.1520(b)(c) (Exhibit 3F)." See Transcript at 20.

There is sufficient information for the ALJ to have made an informed decision. Although his explanation for giving no weight to the VA's Rating Decision is not a model of clarity, the explanation does not warrant a remand for two reasons. First, the VA's finding of disability is not binding

on the Social Security Administration. See Evans v. Colvin, 2016 WL 8346542 (E.D.Ark. 2016) (Deere, M.J.), report and recommendation adopted, 2017 WL 763925 (E.D.Ark. 2017) (Miller, J.). Second, a fair reading of the Decision indicates that it is largely a summary of the evidence the VA relied upon in awarding Bloom benefits; the Decision provides little, if any, new or additional evidence to support his claim in this proceeding.

IMPROPER HYPOTHETICAL QUESTION. Bloom offers a fourth reason why the ALJ's decision is not supported by substantial evidence on the record as a whole. Bloom maintains that the ALJ relied upon the answer to an improperly phrased hypothetical question at step five.

Testimony from a vocational expert is substantial evidence on the record as a whole only when "the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." See Taylor v. Chater, 118 F.3d 1274, 1278 (8th Cir. 1997). The question must include all of the claimant's impairments that are substantially supported by the record as a whole. See Id.

A vocational expert was asked a series of hypothetical questions during the administrative hearing. See Transcript at 46-52. The vocational expert was first asked to assume an individual of Bloom's age, education, and work experience who could perform a reduced range of sedentary

work. The vocational expert testified that there was work available for such an individual. The ALJ then asked the vocational expert to assume the same hypothetical individual with the following additional limitation: he is unable to execute his duties for "as much as two hours a day on a daily basis" as a result of his impairments. See Transcript at 49. The vocational expert testified that there was no work available for such an individual.

The ALJ did not err in crafting the first hypothetical question or in relying upon the vocational expert's answer to the question. The question captured the concrete consequences of Bloom's limitations and was adequately phrased as it conformed to the assessment of his residual functional capacity. Admittedly, the question did not include the "two hours off" restriction included in the second question. The ALJ did not err, though, in failing to incorporate the restriction into the first question, particularly in light of Ames and Bruffett's progress notes. Bloom clearly has mental impairments and experiences back pain, but the ALJ could and did find that Bloom's mental impairments and back pain do not prevent him from performing a reduced range of sedentary work.

CONCLUSION. On the basis of the foregoing, the Court finds that there is substantial evidence on the record as a whole to support the ALJ's

findings. Bloom's complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 22nd day of October, 2020.

_____
UNITED STATES MAGISTRATE JUDGE